THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JAMES E. FORD, Defendant-Appellant.

First District (4th Division)   No. 81—1890

Opinion filed September 22, 1983.

60

Steven Clark, of State Appellate Defender's Office, of Chicago (Daniel C. Marson, of Winston & Strawn, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Bruce A. Cardello, and James F. Sullivan, Assistant State's Attorneys, of counsel), for the People.

JUSTICE JOHNSON delivered the opinion of the court:

Defendant, James E. Ford, appeals his conviction for murder and armed robbery (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(a), 18—2(a)) and raises the following issues for review: (1) whether the trial court erred in not giving an instruction to the jury explaining that a verdict of not guilty by reason of insanity results in a hearing to determine whether he is subject to involuntary commitment and (2) whether the trial court erred in not granting his motion for a mistrial where statements made by the prosecutor were improper and prejudicial, and denied him a fair trial.

We affirm.

The facts of this case are unrebutted. Testimony at trial established the following.

John Rimkus, a Chicago policeman, testified that on October 24, 1979, at about 11:15 p.m., he went to the subway station at 30 South Dearborn Street, in Chicago, Illinois, in response to a radio message. He saw a man, later identified as Joseph Ardell, lying in a pool of blood on the subway platform. Ardell was dead with stab wounds on his neck. There was no money in his wallet.

Austin Ware, a Chicago policeman, testified that at about 4:10 a.m. on October 25, 1979, he was in the subway station at 128 North State Street in Chicago. He saw five people exiting a subway train and shouting that a crazy man was aboard. When Ware boarded the train, he saw two men pushing each other, one of whom was the defendant. The other person, who was older than defendant, said that defendant was crazy and was threatening him. Ware pulled defendant off the train, and, during a protective search, he discovered a bloodstained knife in defendant's pocket. Ware advised defendant of his *Miranda* rights; he observed blood on defendant's trousers and shoes.

When Ware asked defendant about the blood on his clothes, defendant gave various stories: first he said he had been cutting chickens at home; then he said his mouth was bleeding, that his head had been "busted," and finally he said he had been assisting a man on the "el" who had been cut about the face and neck.

After Ware took defendant to the police station, a Chicago Transit Authority (CTA) pass with the name "John Wahlund" was taken from defendant and also money which had blood on it. Ware observed that defendant had been drinking but was not intoxicated.

Robert M. Kirschner, a forensic pathologist and deputy medical examiner for Cook County, performed an autopsy on the victim on October 25, 1979. The victim's death was caused by stab wounds to the neck.

John Markham, a Chicago police detective, had conversations with defendant on October 25, 1979. After *Miranda* warnings were given to him, defendant stated that while he was in the subway a man said, "Hey, baby," and patted defendant's behind. Defendant pulled out a knife and stabbed the man. Markham stated that defendant was not under the influence of alcohol or drugs when he made the statement.

Bernadett Kwak, a microanalyst for the Chicago police department, stated that the stains on defendant's clothes, the knife and the money were blood.

John Wahlund testified that he was robbed in a subway station on October 14, 1979, at 3:50 a.m. A man grabbed him from behind and held a knife against his neck. The offender took Wahlund's CTA pass and $50.

James Linn, an assistant State's Attorney, described the circumstances surrounding the taking of defendant's confession and then read the statement to the jury. After the State rested, two witnesses testified for the defense.

Dr. Bobby Wright, a clinical psychologist and director of the Garfield Comprehensive Community Mental Health Center, testified as an expert witness. He administered psychological tests to defendant and concluded that defendant suffered from alcoholism dependency. In Dr. Wright's opinion, there was a reasonable doubt whether defendant possessed substantial capacity to appreciate the criminality of his conduct or to conform his behavior to the requirements of law.

Geraldine Galvin testified that she has known defendant for approximately 10 years, that she and defendant lived together for about a year, and that defendant is the father of her child. The witness stated that defendant often became violent after drinking and that she had filed complaints against him for battery.

Detective John Markham was recalled as a witness on rebuttal and gave his opinion that defendant was sane on October 25, 1979.

Dr. Gerson Kaplan, a psychiatrist, was qualified as an expert witness. He examined defendant twice and diagnosed defendant as having an antisocial personality. In Dr. Kaplan's opinion, defendant was sane at the time he murdered the victim.

After this jury trial, defendant was convicted of murder and armed robbery. He was sentenced to a term of natural life without parole for the murder, and to a concurrent term of 60 years for the armed robbery. Defendant appeals.

■ The first issue raised by defendant is whether the trial court erred in not giving an instruction to the jury explaining that a verdict of not guilty by reason of insanity results in a hearing to determine whether the defendant is subject to involuntary commitment. Defendant argues that the prosecution implied that he would go free if found not guilty by reason of insanity. This argument confused the jury and biased them against such a verdict. Defendant also argues that Illinois courts should adopt a rule requiring explanation of the consequences of a verdict of not guilty by reason of insanity. Alternatively, defendant argues that even if the instruction is not mandatory, it should be given when requested and should have been allowed because of the special circumstances, namely, the misrepresentation of the consequences of an insanity acquittal.

Defendant tendered the following instruction:

> "If you find the Defendant not guilty by reason of insanity, you must find that the Defendant committed the acts charged but at the time of the commission of these acts the Defendant was insane. In the event of a verdict of not guilty by reason of insanity, a hearing shall be held to determine whether the Defendant is subject to involuntary admission."

The trial judge refused the instruction because the jury need not be confronted with the matter of what happens to a defendant after he is found not guilty by reason of insanity.

In *People v. Meeker* (1980), 86 Ill. App. 3d 162, 170, 407 N.E.2d 1058, 1065, the appellate court declined to adopt as a general rule a requirement that the jury be given an instruction which relates the consequences of a verdict of not guilty by reason of insanity. (See also *People v. LaFiura* (1981), 92 Ill. App. 3d 714, 415 N.E.2d 1365.) The court reasoned that such an instruction would inject into the trial and the deliberations of the jury extraneous and irrelevant matters that would have no bearing on defendant's guilt or innocence. In the court's view, the jury's verdict should not be influenced by its possible

consequences. Such an instruction invites the jury to reach a compromise verdict, finding defendant not guilty by reason of insanity despite clear evidence of legal sanity because defendant will be incarcerated anyway. Requiring an instruction in all cases, or even in close cases, involving an insanity defense would not help the jury reach a true and correct verdict. (*People v. Meeker* (1980), 86 Ill. App. 3d 162, 170.) In accordance with *People v. Meeker*, we hold that in the instant case the trial court did not commit reversible error in refusing defendant's proposed instruction describing the consequences of a verdict of not guilty by reason of insanity.

■ The defendant next argues that the trial court erred in not granting his motion for a mistrial where statements made by the prosecutor were allegedly improper and prejudicial and denied the defendant a fair trial. The allegedly improper comments include the prosecutor's representations that defendant's defense of intoxication was "B.S.," that the defense of intoxication was only recently disclosed by defendant, that the jury should be insulted by this defense of intoxication, that defendant's insanity defense was a "fake," that defendant did not have "a license to kill," and that the jury should not be "fooled" by the defense psychologist.

Defendant argues that these remarks violate the rule which govern prosecutorial argument to the jury which are stated in *People v. Witted* (1979), 79 Ill. App. 3d 156, 165-66, 398 N.E.2d 68, 77. Defendant contends that (1) the above-mentioned remarks violate the rule prohibiting the argument that defense counsel fabricated the defense, (2) the remarks were not based on evidence presented at trial, (3) the State tried to confuse the jury by misrepresenting the insanity defense, (4) the remarks were designed to arouse passions and prejudice the jury, and (5) the prosecution continued to make improper arguments despite repeated objections sustained by the court. Finally, defendant argues that a failure to reverse and remand for a new trial will encourage prosecutors to continue to use such improper argument.

Where a defendant claims prejudice resulting from certain remarks made by the prosecution in closing argument, he must establish that there was a reasonable possibility that the questionable language, in light of all the evidence, was a material factor in his conviction. *People v. Shorter* (1978), 59 Ill. App. 3d 468, 479, 375 N.E.2d 513, 521.

In our opinion, the prosecutor's statements were not a material factor in defendant's conviction. There was evidence from which the jury could conclude that defendant was sane at the time of the of-

fense. Defendant made false exculpatory statements to account for the blood on his clothes; he gave a detailed account of the incident; and an expert witness testified that defendant was sane. Therefore, we hold that statements made by the prosecutor, even if improper, did not constitute reversible error. *People v. Baptist* (1979), 76 Ill. 2d 19, 29, 389 N.E.2d 1200, 1205.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

JIGANTI, J., concurs.

PRESIDING JUSTICE ROMITI, dissenting:

Because I believe this defendant was deprived of a fair trial I respectfully dissent. In *People v. Meeker* (1980), 86 Ill. App. 3d 162, 407 N.E.2d 1058, this court specifically reserved the question of whether under special circumstances, such as misleading prosecutorial comments on the consequences of acquittal by reason of insanity, an instruction such as that requested by defendant here should be given. In *People v. Hebein* (1982), 111 Ill. App. 3d 830, 444 N.E.2d 782, the defendant's contention that such misleading prosecutorial comments had been made was rejected by the court so the issue was again not decided. In this cause, although the majority has not addressed that specific issue, it is clear to me that we are squarely presented with it.

The prosecution successfully prevented defense counsel from having the jury instructed that a verdict of not guilty by reason of insanity would not automatically result in the defendant's release from custody. The pertinent section of the barred instruction stated:

"In the event of a verdict of not guilty by reason of insanity, a hearing shall be held to determine whether the defendant is subject to involuntary admission."

In final argument to the jury the prosecutor then made statements which appear to have been calculated to give the jury precisely the erroneous impression which this instruction would have prevented them from drawing. The prosecutor told them:

"The psychiatrist tells you yes. There was no excuse to be an alcoholic for what he did. They tell you there's ten million alcohol dependents out there and if you believe Dr. Bobby Wright, every one of them has a license to kill, go out and commit free murders because they are all not responsible.

\* \* \*

He says if Mr. Ford drinks, he will kill again. Well, that's fine. You want to let that happen? Let him go.

\* \* \*

That's the defense. They want you to give him a free murder.

\* \* \*

One doesn't accept this, I won't use the word B.S., this insanity defense, this fake insanity defense, this cloud insanity defense guise in alcoholism, because then there are ten million insanity defenses in this country and then there are ten million Joseph Ardells yet to die."

Clearly these arguments implied to the jury that their acceptance of defendant's insanity defense would automatically result in his release. (See *People v. Brown* (1982), 104 Ill. App. 3d 1110, 433 N.E.2d 1081.) This in a case where according to the arresting officer five witnesses described the defendant as "crazy" and where the testimony of defendant's expert witness, if believed by the jury, would have resulted in his acquittal by reason of insanity.

Under these circumstances I believe defendant has been deprived of a fair trial. (*Dipert v. State* (1972), 259 Ind. 260, 286 N.E.2d 405.) I would reverse his conviction and remand the cause for a new trial at which the prosecution may seek his conviction in a manner consonant with his duty to see that justice is done.